## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sharon K. Brown, | **Civil File No.: 10-4860 PAM/SER** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michael J. Astrue, | |
| Defendant. | |

Edward C. Olson, Esq., 331 2nd Avenue South, Suite 240, Minneapolis, Minnesota, 55401, on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 S. 4th Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

STEVEN E RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Sharon K. Brown ("Brown") seeks judicial review of the decision of the Commissioner of Social Security, Michael J. Astrue ("the Commissioner"), who denied Brown's applications for disability-insurance benefits and supplemental security income.  This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  The parties filed cross-motions for summary judgment.  For the reasons set forth below, this Court recommends that Brown's motion for summary judgment be denied and that the Commissioner's motion be granted.

## I.      BACKGROUND

### A.      Procedural History

Brown filed applications for disability insurance benefits and supplemental security income on August 15, 2007, alleging disability as of May 15, 2005, due to injuries of her back, knee and right eye, diabetes, numbness and tingling, depression and memory loss.  (Admin. R. 117-24, 154.)  Brown's applications were denied initially on September 10, 2007, and her request for reconsideration was denied on December 18, 2007.  *Id.* at 49-53, 55-60.  Brown timely requested a hearing that was held on October 1, 2009, before Administrative Law Judge George Gaffney ("the ALJ").  *Id.* at 66-67, 17-44.  The ALJ issued an unfavorable decision on November 12, 2009.  *Id.* at 7-16.  On January 14, 2010, Brown sought Appeals Council's review of the ALJ's decision, which was denied.  *Id.* at 1-5.  The ALJ's decision, therefore, became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  Brown now seeks judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

### B.      Plaintiff's Testimony

Brown is a high school graduate and has work experience as a school bus aide and a personal care attendant, although Brown was a personal care attendant for less than six months.  (Admin. R. at 20-21, 40.)  In the 1980s and early 1990s, Brown did not work outside the home.  *Id.* at 22.  Brown last worked in June 2004, when her job as a school bus aide was eliminated.  *Id.* at 24-25.  At the time of the hearing, Brown lived with her twenty-year-old daughter and their only income was General Assistance.  *Id.* at 24.

Brown testified she was a passenger in a car that hit a deer in May 2005, and was injured when her air bag deployed.  *Id.* at 25.  Brown suffered back and leg pain, that prevented her from working.  *Id.* at 25.  And, she had tingling and leg pain from diabetes.  *Id.* at 29-30.  The pain prevented her from sleeping at night.  *Id.* at 30.  Depression also kept her up at night.  *Id.* at 34.

Brown's back pain was constant.  *Id.* at 32.  Her back was stiff in the morning, and rainy days aggravated her pain, in particular her knee pain.  *Id.* at 34-35.  She could walk two or three blocks before needing a break.  *Id.* at 36.  Back pain prevented Brown from finding a comfortable sitting position.  *Id.* at 37.  She did not take pain medication.  *Id.* at 33.

With her daughter's help Brown did housework, including cooking, doing dishes, vacuuming and laundry.  *Id.* at 37-38.  Brown could not drive when her back was aching and her mind was on her pain.  *Id.* at 38-39.

At the conclusion of Brown's testimony, Brown's counsel asked whether she ever had the neuropsychological evaluation her physician had suggested, and Brown said she missed the appointment.  *Id.* at 39.  Brown's counsel then asked the ALJ to order a consultative examination "to fully and fairly develop the record regarding possible non-exertional impairments."  *Id.* at 39-40.

### C.    Function Reports

Brown completed a Social Security Administration ("SSA") form, "Function Report-Adult," on August 31, 2007.  Admin. R. at 186-93.  Brown's daily routine included personal hygiene, eating meals, calling her mother, reading the bible, working

on a puzzle, going outside for a walk and watching the news. *Id.* at 186. She prepared complete meals daily, which took about an hour and thirty minutes. *Id.* at 188. She did a little housework. *Id.* Brown could get around by walking, using public transportation or riding in a car. *Id.* at 189. Brown shopped for food twice a month. *Id.* If she felt up to it, she did puzzles, read and crocheted every day. *Id.* at 190. Brown went to church regularly, and also sometimes played bingo at a casino. *Id.*

Brown's back and knee pain limited her lifting to ten pounds, and also limited her ability to squat, bend, stand, reach, kneel and climb stairs. *Id.* at 191. Following written and spoken instructions, and getting along with people, including authority figures were not a problem for her. *Id.* at 191-92.

Brown's sister, Janet Black, completed a "Function Report-Adult-Third Party" on August 30, 2007, at the request of the SSA. *Id.* at 164-71. Black corroborated Brown's daily activities. *Id.* at 164. Black opined that Brown's injuries affected Brown's legs "very much," but reported that Brown had no problem with personal care. *Id.* at 165. Black also corroborated Brown's ability to cook her own meals, do household chores once a week for two hours, and walk outside daily. *Id.* at 166-67. Black reported that Brown shopped for food and clothes once a week and engaged in her hobbies frequently. *Id.* at 167. Brown's church attendance and casino trips were also confirmed through Black. *Id.* at 168.

Black corroborated Brown's physical limitations, and reported Brown could walk four blocks before needing to rest for twenty minutes. *Id.* at 169. Black indicated Brown could pay attention "very well," and followed written and spoken directions. *Id.* Black

agreed that Brown got along with others, including authority figures.  *Id.* at 170.  Black opined that Brown could handle stress and changes in routine.  *Id.*

In an undated form entitled "Disability Report-Appeals," Brown reported that her pain had worsened in September 2007, and she was now limited to things she could do in her home, a little at a time.  *Id.* at 197-202.  Brown reported daily pain, and many of her personal needs went unmet.  *Id.* at 200.  Since her last disability report, she had less energy and more pain in her legs and feet.  *Id.*

### D.    Medical Evidence

Brown was a front seat passenger in a car that struck a deer on May 21, 2005.  *Id.* at 227.  Her air bag deployed, and Brown had some minor facial injuries but did not lose consciousness.  *Id.*  At the accident scene, she was able to walk.  *Id.*  Brown was taken to the emergency room at North Memorial Health Care and was upset and anxious.  *Id.* Brown complained that "her whole front" felt like it was burning, and she had a sensation of a foreign object in her eye.  *Id.*

On examination, Brown had a right cheek abrasion with little contusion.  *Id.*  She had a subconjunctival hemorrhage on the right eye.  *Id.* at 227-28.  Brown experienced mild cervical tenderness, but her cervical range of motion was "pretty good."  *Id.* at 228. She did not have spinal tenderness in her thoracic or lumbar spine or tenderness of her upper or lower extremities.  *Id.*  Brown was alert, oriented, conversant, and her gait was stable.  *Id.*

After Brown's eyes were irrigated, her sensation of a foreign body vanished.  *Id.* Dr. Kolar considered discharging Brown, but Brown said she was still too sore, and

Brown's family members seemed upset that it was too soon to discharge her.  *Id.*  Dr. Kolar treated Brown with Vicodin and Ibuprofen.  Over time, Brown said her neck was hurting even more but an x-ray was negative for fracture.  *Id.*  The x-ray of Brown's cervical spine indicated multilevel degenerative disk disease with osteophytes,[1] sclerosis,[2] and disk space narrowing.  *Id.* at 230.  After receiving more pain medication, she was discharged.  *Id.*

Brown went to the Hennepin County Medical Center ("HCMC") several days later for treatment of worsening facial pain and blurry vision.  *Id.* at 240.  Brown had a severe headache with some nausea earlier that day but no headache at the time of examination. *Id.* at 241.  Brown also complained of thigh pain when sitting.  *Id.*  Dr. Collier diagnosed:

> [s]uperficial burn to the face needing antibiotic ointment. Probable post traumatic iritis of the [right eye] with subconjunctival hemorrhage, clear anterior chamber, intraocular pressure of 11, and no corneal abrasion on stain.

*Id.* Dr. Collier recommended that Brown see an ophthalmologist.  *Id.*  Brown was prescribed Hydrocodone and Bacitracin ointment.  *Id.*

On June 3, 2005, Brown underwent an initial evaluation by Dr. Hahn at the Northwoods Spine Institute.  *Id.* at 233-35. Brown complained of neck, upper back, low back and abdominal pain as a result of the car accident.  *Id.* at 233.  Brown reported constant tenderness and stiffness throughout her spine.  *Id.*  She described the pain as a

---

[1] An osteophyte is a bony outgrowth or protuberance. *Stedman's Medical Dictionary* (*Stedman's*) 1285 (27th ed. 2000)

[2] Sclerosis, a synonym of induration, is the process of becoming extremely firm or hard, or having such physical features. *Stedman's* at 1604, 893.

mixture of aching, shooting, cramping and burning, and the pain was present during routine daily activities, including walking and sitting. *Id.*

On examination, Brown was moderately tender throughout the cervical, thoracic, and lumbar regions and shoulder joints. *Id.* at 234. Dr. Hahn noted muscle spasms and tenderness in the rhomboids, levator scapulae and other regions. *Id.* Brown's cervical range of motion was diminished, but her lumbar range of motion was not markedly diminished. *Id.* Brown's upper and lower extremity neurosensory evaluations were normal. *Id.* Dr. Hahn diagnosed cervical, thoracic and lumbar sprain/strain with associated vertebral mechanical dysfunction, paraspinal soft-tissue myofascitis, and lower extremity neuroparesthesias associated with lumbar intervertebral disc derangement. *Id.* at 235. Dr. Hahn recommended chiropractic adjustment and a spinal stabilization exercise program. *Id.* He also ordered lumbar x-rays and electrical muscle stimulation for pain relief. *Id.*

Brown saw Dr. Douglas Pryce at HCMC on July 22, 2005, and Dr. Pryce noted Brown was not taking her medications for diabetes or hypertension. *Id.* at 278. Brown's only concern was back pain and disability. *Id.* She explained that because her daughter almost died during childbirth, and she was caring for her granddaughter since then she was not following up on her diabetes and hypertension treatments. *Id.* at 278-79. On examination, Brown was not significantly overweight but her diabetes and hypertension were not under control. *Id.* at 279. Dr. Pryce restarted Brown on Lisinopril for hypertension and Glyburide for diabetes. *Id.* The chiropractic office x-rays of Brown's

lumbar spine were of poor quality, and Dr. Pryce wanted to get new films to evaluate Brown's back pain. *Id.*

Brown's hypertension and blood sugars were not under control. *Id.* at 276. Brown complained of back pain. *Id.* at 277. Dr. Pryce said Brown was disabled from her back injury but did a lot of babysitting for her grandchild. *Id.* Dr. Pryce increased Brown's medications for diabetes and hypertension, and he treated a plantar wart. *Id.* He further noted that Brown's back pain was stable, and her traumatic iritis was resolving. *Id.* at 278.

Even before the August 31, 2005 follow-up with Dr. Pryce, Brown's blood sugars were flucuating. *Id.* at 274-75. On examination, Brown's blood pressure was high, and Dr. Pryce increased her Lisinopril. *Id.* at 274. He noted Brown was exercising regularly, and he would focus on exercise and diet to control Brown's diabetes. *Id.*

Brown was homeless, and her blood pressure was above normal when she saw Dr. Pryce on October 12, 2005. *Id.* at 273. Brown was staying with her daughter and granddaughter in a motel, and she was getting disability from the Minnesota Family Investment Program, but they wanted her to return to work. *Id.* Brown asked Dr. Pryce for help. *Id.* Dr. Pryce prescribed Hydrochlorothiazide to get Brown's blood pressure under control. *Id.* at 274. He noted Brown's back precluded any jobs requiring heavy lifting or daycare where she had to lift kids. *Id.* Dr. Pryce also ordered a neuropsychiatric evaluation, because he thought Brown might be developmentally delayed or might have a psychiatric illness. *Id.*

Brown saw Dr. Pryce for a blood sugar and blood pressure check on November 10, 2005, and Brown was accompanied by her one-year-old granddaughter whom she was babysitting.  *Id.* at 270.  At this visit, Dr. Pryce noted that Brown's blood pressure and diabetes were under control, but she complained of diffuse muscle aches.  *Id.*  Two weeks later, Brown saw Dr. Pryce for foot and back pain.  *Id.* at 269.  Dr. Pryce noted that Brown walked a lot and had plantar warts and calluses on her left foot.  *Id.*  Brown's back pain was stable, and her diabetes and hypertension were under control.  *Id.*

Brown fell on her right knee on November 24, 2005, and went to the emergency room at HCMC for treatment.  *Id.* at 243-45.  The examining physician, Dr. McClain, noted Brown was obese, pleasant and not in acute distress.  *Id.* at 244.  Brown's right knee had some swelling, but she could stand on it, and she did not have joint tenderness.  *Id.* She had full range of motion and intact strength, and x-ray was negative for fracture.  *Id.* at 244, 251-52.  Dr. McClain diagnosed knee contusion and treated Brown with Ibuprofen.  *Id.* at 244.

Brown was feeling much better when she saw Dr. Pryce on March 24, 2006.  *Id.* at 267.  Her blood sugars were normal and her blood pressure was closer to controlled.  *Id.* Dr. Pryce treated Brown for plantar warts.  *Id.* at 267-68.  Dr. Pryce also made the following note about disability in the treatment record, "[a]lthough she has some back pain, that with advancing age and probably limited skill set and possibly other problems such as psychological or developmental, I am going to have her get Neuropsych testing for disability assessment."  *Id.* at 268.

Brown followed up on her diabetes with Dr. Pryce on June 6, 2007.  *Id.* at 253. Brown's diabetes was well-controlled, but she still had some right knee pain and swelling.  *Id.*  Brown reported that her knee discomfort came and went and occasionally her knee popped.  *Id.*  Brown also had chronic back pain with no significant leg symptoms at that time.  *Id.* at 253-54.  On examination, Brown had mild swelling of the knees.  *Id.* at 254.  Dr. Pryce diagnosed controlled diabetes, uncontrolled hypertension, dyslipidemia, vitamin D deficiency and degenerative joint disease ("DJD") of the back. *Id.*  Dr. Pryce noted Brown was tolerating her back pain well, but it was the cause of "her chronic disability."  *Id.*

Brown was happy with her life when she saw Dr. Pryce on July 13, 2006.  *Id.* at 261-62.  She had a new place to live, and she planned to go to school to study art.  *Id.* at 262.  Brown's only physical complaint was of calluses on her feet, caused by the amount of time she spent walking every day.  *Id.*

In September 2006, things had changed for the worse and Brown was upset.  *Id.* at 260.  She was helping the police arrest her son because he would be safer in jail than abusing drugs on the street.  *Id.*  Her blood pressure was elevated, and Brown admitted she had not taken her blood pressure medication.  *Id.* at 260-61.  Brown also complained about getting calluses on her feet because she did so much walking.  *Id.* at 261.  Dr. Pryce referred her to a podiatrist.  *Id.*

Brown asked Dr. Pryce about disability on January 11, 2007.  *Id.* at 257.  Dr. Pryce noted Brown got very emotional about social stressors in her life but she had been more upset the last time he saw her, so he felt she was presently coping well.  *Id.* at 257-

58.   Brown was distressed that her son was incarcerated and being moved around the state.  Id. at 257.  Dr. Pryce felt Brown's emotions were affecting her blood pressure.  *Id.* at 258.

Regarding disability, Brown complained of muscle spasms in her legs and feet at night, then; she "change[d] the story to her backaches."  *Id.*  Dr. Pryce noted, "[a]t one point she says they [backaches] come and go, then she makes it sound like they are there all the time.  Then she asks me about disability."  *Id.*  When Dr. Pryce asked Brown why she could not work, she said she had to take care of her family and employers would not allow her to miss work.  *Id.*  Brown then asked for a workup of her back because she had accidents in the 1980s, 1999 and 2005.  *Id.*  Dr. Pryce agreed to do a back x-ray.  *Id.*  On physical examination, Brown's straight leg raise test was negative bilaterally.  *Id.*  Her sensation and reflexes were normal.  *Id.*  X-rays of Brown's lumbar spine indicated disc space narrowing at most levels, most prominent at L5/S1 with osteophytic spurring and endplate sclerosis.  *Id.* at 250.  Mild facet hypertrophy in the lower lumbar spine also existed.  *Id.*

Brown saw Dr. Pryce on March 8, 2007, to follow up on her chronic back pain and stiffness, and "on again off again" right knee pain.  *Id.* at 255-57.  Dr. Pryce again noted Brown had not taken her blood pressure medication.  *Id.* at 255.  Brown's diabetes was under control.  *Id.* at 256.  Dr. Pryce noted Brown had been asking for disability for back pain that went back "many, many years."  *Id.*

On examination, Brown's back was stiff and mildly tender in the lumbar sacral region, and her right knee was larger than her left but without swelling.  *Id.*  Her right

11

knee exhibited mild tenderness with extreme range of motion, but relatively good range of motion and no joint laxity.  *Id.*  Dr. Pryce ordered an x-ray of Brown's right knee and an MRI of her lumbar spine.  *Id.* at 257.  Her right knee x-ray showed no joint effusion or evidence of fracture.  *Id.* at 249.

Brown had a lumbar MRI on March 26, 2007.  *Id.* at 365.  The impression from the MRI was background of mild scoliosis, degenerative disc changes at L5-S1 and L4-5, large extruded disc at L5-S1 with stenosis,[3] and slightly smaller extruded disc at L4-5. *Id.*

On September 9, 2007, Dr. Salmi reviewed Brown's medical records and completed a "Physical Residual Functional Capacity Assessment" form regarding Brown at the request of the SSA.  *Id.* at 298-305.  Dr. Salmi opined that Brown could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk six hours out of an eight hour workday, sit six hours out of an eight hour workday, and occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl.  *Id.* at 299-300.  In support of his opinion, Dr. Salmi cited Brown's back x-ray indicating "DJD", but that she had no leg or radicular symptoms, her strength and range of motion were good, and straight leg raise test and Babinski tests were negative.  *Id.* at 299. Brown's knee x-ray was unremarkable.  *Id.*  Dr. Salmi also noted that Brown told Dr. Pryce she could not work because she had to take care of her family, and Dr. Pryce said that would not be accepted as a reason to get disability.  *Id.* at 300.  Dr. Eames reviewed the record and affirmed Dr. Salmi's opinion on December 18, 2007.  *Id.* at 311-31.

---

[3] Stenosis is a narrowing of any canal or orifice.  *Stedman's* at 1695.

State agency consultant Dr. Conroe completed a Psychiatric Review Technique Form regarding Brown at the request of the SSA on September 7, 2007.  *Id.* at 284-97. Dr. Conroe concluded  Brown did not have a medically determinable mental impairment. *Id.* at 284.  Dr. Conroe also stated that there was no evidence in the file of psychiatric treatment or evaluations and "no mental problems are noted."  *Id.* at 296.  Dr. Conroe noted there was nothing in Brown's recitation of her activities of daily living to support any mental limitations.  *Id.*  Dr. Sharon Frederiksen affirmed Dr. Conroe's opinion on December 18, 2007.  *Id.* at 316.

Brown next saw Dr. Pryce on October 11, 2007, and her mood was better than the last time Dr. Pryce saw her, when she had been anxious.  *Id.* at 358.  Brown's blood pressure was "reasonable for a diabetic."  *Id.*  Her back pain was "doing very well," and she was tolerating it "without any big problems."  *Id.*  Brown still had family concerns. *Id.* at 359.

Dr. Pryce completed a "Request for Medical Opinion" form regarding Brown on December 4, 2007.  *Id.* at 307.  Dr. Pryce indicated Brown would be unable to work for the foreseeable future due to degenerative spine disease.  *Id.*

When Brown followed up with Dr. Pryce in December 2007, she reported right knee pain worse than her usual chronic pain.  *Id.* at 355.  There was a little swelling in her knees and some numbness in her feet from diabetes.  *Id.* at 355-56.  Dr. Pryce noted Brown looked "rather well," but she had her granddaughter with her, who was causing a lot of disruption, and potentially responsible for Brown's mildly elevated blood pressure.

*Id.* at 356.  Dr. Pryce referred Brown for physical therapy because she needed to stay active although her knees were bothering her.  *Id.* at 357.

Brown underwent a physical therapy knee evaluation on February 14, 2008, with Physical Therapist Mariah Ohlsen at HCMC.  *Id.* at 351-54.  Brown reported that her right knee hurt since a car accident in 2005, and rated her pain six out of ten.  *Id.* at 351. Brown had trouble walking, climbing stairs, kneeling and bending.  *Id.*  Ohlsen noted mild effusion[4] and decreased global strength of the lower extremities.  *Id.* at 353.  Brown was shown a home exercise program.  *Id.* at 353-54.

Brown then participated in seven sessions of physical therapy between February 14, 2008 and April 30, 2008.  *Id.* at 341.  After the physical therapy sessions, Brown rated her pain at a level one out of ten, but she had a constant mild throbbing in her right knee.  *Id.*  Brown met her goals of increased walking without an increase in pain.  *Id.* at 342.  She was discharged because she was able to continue independently with a home exercise program.  *Id.*

Brown followed up with Dr. Pryce for diabetes and hypertension on March 13, 2008.  *Id.* at 346.  Brown's blood sugars were up, and family strife interfered with her diet and exercise regime.  *Id.*  Brown complained of right knee pain and back pain.  *Id.* at 347.  Dr. Pryce noted Brown was trying to get disability, and he agreed she was disabled by lumbar spinal problems, "a little bit of neuropathy from diabetes," and depression with a possible anxiety component.  *Id.*

---

[4] Joint effusion is increased fluid in a synovial cavity of a joint.  *Stedman's at* 520.

On May 29, 2008, Dr. Pryce noted Brown was pretty functional, and her blood sugar was well controlled.  *Id.*  Her hypertension was not well controlled, however, and she was not taking her medications.  *Id.* at 334.  Brown asked Dr. Pryce to complete a disability form about her chronic back pain.  *Id.*  Dr. Pryce noted:

> I think that she is functionally disabled due to her limited skill set, lack of education or credentials, and age of 54.  Thus, she cannot do manual labor with her back, based on her clinical symptoms and the fact that her MRI shows significant disc disease.  In addition to that, I do not think it has been evaluated in the past, but I have noticed her when she has been stressed to be highly anxious, and she might have an anxiety disorder.  She also may have cognitive impairment, possibly, a low level of cognitive functioning.

*Id.*

On November 18, 2008, Dr. Pryce noted Brown was taking good care of herself, walking for exercise and losing a little weight.  *Id.* at 329.  She was also coping with the social stressors in her life.  *Id.* at 330.  Despite her family problems and stress, she did not look anxious.  *Id.*  Brown's back pain and hypertension were under control.  *Id.*  Brown's diabetes and hypertension remained under good control when she saw Dr. Pryce on May 7, 2009.  *Id.* at 327-28.  Brown was doing well with regular exercise.  *Id.* at 328.

Brown believed her right eye was never the same after an airbag injury in 2005, and she was evaluated at HCMC Eye Clinic on July 28, 2009.  *Id.* at 318, 320.  On examination, Brown did not have diabetic retinopathy but had a refractive error and an early cataract.  *Id.* at 320.

On September 25, 2009, Dr. Pryce wrote a letter to Brown's attorney, offering his opinion of Brown's disability.  *Id.* at 364.  Dr. Pryce had been Brown's primary care

doctor since July 2000 and in his opinion, Brown had two conditions that reduced her to sedentary work.  *Id.*  First, she suffered from "degenerative joint disease of the lumbosacral spine with significant herniated disk that radiates pain and weakness to the leg."  *Id.*  Secondly, she also experienced neuropathy from diabetes.  *Id.*  Dr. Pryce opined that subsequent to May 5, 2005, Brown would be unable to stand on her feet more than two hours out of an eight-hour day on a sustained basis, and she could only lift ten pounds on an occasional basis.  *Id.*  Further, she could not handle a job that required frequent carrying and lifting or "a lot of leg and foot controls."  *Id.*  For only two hours out of an eight-hour work day, she could do a certain amount of standing and walking.  *Id.*

### E.    Vocational Expert Testimony

David Russell testified as a vocational expert ("VE") at the hearing before the ALJ.  Admin. R. at 40.  Russell is a certified rehabilitation counselor and certified disability management specialist and has thirty-five years of experience in the vocational field.  *Id.*  The vocational aspects of Social Security disability regulations were familiar to Russell.  *Id.* at 41.  His testimony was based on the vocational aspects of Brown's file and Brown's testimony.  *Id.*  Russell was not previously acquainted with Brown.  *Id.*  An exhibit documenting Brown's past relevant work was prepared, but Russell testified that the job of personal care attendant should be eliminated from the exhibit.  *Id.*, 216.

During Brown's testimony, Russell asked Brown about how she performed her job as a bus aide.  *Id.* at 27.  Brown had to move children who were in wheelchairs into a bus, using a lift, and then lock in the wheelchairs.  *Id.* at 27-28.  She also broke up altercations

between children.  *Id.* at 28.  And it was her responsibility to follow safety procedures if there was an accident, including helping the children off the bus.  *Id.*  Russell stated the bus aide job was listed as a light exertional level in the Dictionary of Occupational Titles ("DOT").  *Id.* at 29.

The ALJ asked Russell to consider the working ability of an individual at two different ages, a person currently age 56 and a person age 52 at the alleged onset date, who had a high school education and the past work [bus aide] set forth in Exhibit 11E as amended.  *Id.* at 41, 216.  The ALJ then posed the following hypothetical scenario regarding the working ability of the above-described person who was:  (1) limited to lifting up to twenty pounds occasionally and ten pounds frequently; (2) able to stand and sit six hours each in an eight hour workday; (3) limited to walking three blocks; (4) limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and (5) limited to occasional exposure to humidity and wetness.  *Id.* at 41-42.  Russell responded that such a person could perform Brown's past work as a school bus aide, either as she had performed the job or as the job was normally performed in the economy at a light exertional level.  *Id.* at 42.  For a second hypothetical question, the ALJ added to the first scenario that the person would be limited to simple, routine tasks.  *Id.*  Russell responded that such a person could perform Brown's past work.  *Id.*

For a third hypothetical question, the ALJ limited the person to:  (1) lifting ten pounds occasionally and five frequently; (2) standing two hours in an eight hour workday and sitting six hours; (3) occasional climbing, balancing, stooping, kneeling, crouching, and crawling; (4) occasional exposure to humidity and wetness; and (5) simple, routine

work.  *Id.* at 42-43.  Russell testified such a person could not perform Brown's past work because the residual functional capacity was at a sedentary exertional level.  *Id.* at 43.

### F.    The ALJ's Decision

The ALJ issued an unfavorable decision on November 12, 2009.  *Id.* at 7-16.  In finding that Brown was not disabled, the ALJ employed the required five-step evaluation considering: (1) whether Brown was engaged in substantial gainful activity; (2) whether Brown had a severe impairment; (3) whether Brown's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Brown was capable of returning to past work; and (5) whether Brown could do other work existing in significant numbers in the regional or national economy.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).

At the first step of the evaluation, the ALJ found that Brown had not engaged in substantial gainful activity since the alleged onset date of May 15, 2005.  Admin. R. at 12.  At the second step, the ALJ determined that Brown had severe impairments of degenerative disc disease, diabetes mellitus with related neuropathy, and a right knee disorder with related pain.  *Id.* at 12.  The ALJ did not find Brown's impairments of hypertension and vision problems to be severe because "the record does not suggest that these conditions present even minimal limitations to the claimant."  *Id.* at 13.

The ALJ also noted Brown requested a consultative examination to evaluate her mental status, but the ALJ declined because "the record is sufficient so that a determination can be made on this issue."  *Id.*  Because it did not cause more than minimal limitation in her ability to perform basic mental work activities, the ALJ

concluded that Brown's medically determinable impairment of depression was nonsevere. *Id.* In reaching this conclusion, the ALJ evaluated the functional areas set out in the disability regulations for evaluating mental disorders in section 12.00C of the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* In the first functional area, the ALJ found Brown had no limitations in her activities of daily living because she walked for exercise, attended to her personal hygiene, read the bible, worked on puzzles, watched television, prepared meals, cleaned, grocery shopped, crocheted and went to church and a casino on a regular basis. *Id.*

In the second functional area, social functioning, Brown had no limitation because she did not have legal difficulties, she did not have difficulty getting along with family or friends, she used public transportation, she got along with authority figures, and handled changes in routine. *Id.* In the third functional area, Brown had mild limitation in concentration, persistence or pace but did not have difficulty pursuing tasks she enjoyed, like reading and working on puzzles. *Id.* In the fourth functional area, episodes of decompensation, there was no evidence Brown experienced an episode of decompensation of extended duration. *Id.* The ALJ concluded Brown's depression was nonsevere because it caused no more than mild limitation in any of the first three functional areas and no episodes of decompensation. *Id.* at 14 (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)).

At step three, the ALJ determined that Brown did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 14.

At step four, the ALJ found that Brown had the residual functional capacity:

> To perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with these additional restrictions:  walk a maximum of three blocks at a time; only occasionally climb stairs or ladders; only occasionally balance, stoop, kneel, crouch or crawl.

*Id.*  In reaching this RFC determination, the ALJ considered the opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927 and Social Security Rulings ("SSRs") 96-2p, 96-5p, 96-6p and 06-3p.  *Id.*  The ALJ placed significant weight on the opinions of the state agency physicians and psychologists who reviewed Brown's record at the initial and reconsideration levels because their opinions were consistent with the record as a whole.  *Id.*

The ALJ placed limited weight on Dr. Pryce's opinion that Brown was disabled for the following reasons.  *Id.*  First, the record did not establish that Dr. Pryce's definition of disability was consistent with the definition used by the Social Security Administration.  *Id.* at 15.  Second, the ALJ noted that while he rejected Dr. Pryce's limitations, those limitations did not preclude all work activity.  *Id.*  Third, the ALJ found that the record lacked objective findings to support Dr. Pryce's statements.  *Id.*  Fourth, the ALJ found Brown's level of activity contradicted Dr. Pryce's limitations.  *Id.*

The ALJ also rejected Brown's argument that she was disabled under the criteria of Vocational Rule 201.12.[5]  *Id.*  Rule 201.12 applies to a person limited to sedentary work, and the ALJ found Brown was only limited to light work.  *Id.*

The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . ."  *Id.* (citing 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p, 96-7p and *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984). First, the ALJ found Brown's activity level inconsistent with her allegation of disability.  *Id.*  Second, the ALJ found Brown's depression was not disabling because she did not seek any treatment for depression.  *Id.*  Third, the medications Brown took for some of her impairments, Glyburide, Lipitor, Hydrochlorothiazide and Lisinopril, provided significant relief although Brown did not take them consistently, which suggested her impairments were not as disabling as she claimed.  *Id.*

Fourth, the ALJ considered Brown's work history, which he noted was erratic prior to Brown's applications for disability, suggesting she stayed out of the workforce in the past for reasons unrelated to disability.  *Id.*  Fifth, the ALJ considered the written statements of Janet Black, Brown's sister, but did not give her statements much weight because Black was not a medical source, and her relationship to Brown gave her incentive to endorse Brown's application for disability.  *Id.* at 16.  Thus, the ALJ found

---

[5]  Medical-Vocational Rule 201.12 provides that persons limited to sedentary work, who are closely approaching advanced age, ages 50-54, and who are high school graduates (or higher education) but their education does not provide for direct entry into skilled work, and their work experience is unskilled or none, are presumptively disabled.  20 C.F.R. Part 404, Subpart P, Appendix 1, Rule 201.12.

"the claimant's statements concerning the intensity, persistence and limiting effect of [the alleged symptoms] are not credible to the extent they are inconsistent with the above residual functional capacity." *Id.* at 15.

Based on the VE's testimony regarding an individual with a profile matching that of Brown's age, education, past work experience, and the severe impairments and residual functional capacity determined by the ALJ, the ALJ concluded Brown could perform her past relevant work as a school bus aide. *Id.* at 16.

## II.    STANDARD OF REVIEW

The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability. *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.* at § 423(d)(2)(A).

### A.    Administrative Review

If a claimant's initial application for benefits is denied, then reconsideration of the decision may be requested. 20 C.F.R. §§ 404.909(a), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429. If the claimant is dissatisfied with the ALJ's decision, an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R.

§§ 404.967, 416.1467.  If the request for review is denied, then the ALJ's decision is final and binding unless the matter is appealed to a federal district court.   20 C.F.R. §§ 404.981, 416.1481.  An appeal to a federal court of the ALJ's decision must occur within sixty days after notice of the Appeals Council's action.  42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

### B.    Judicial Review

This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence."  *Id.*  If "substantial evidence" supports the findings of the Commissioner, then the findings are conclusive.  42 U.S.C. § 405(g).

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  This Court must, nonetheless, "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

"Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing an ALJ's decision, a court analyzes the following factors:  1) the ALJ's findings regarding credibility; 2) the claimant's education, background, work history and age; 3) the medical evidence; 4) the claimant's subjective complaints and description of impairment; 5) third parties' corroboration of the claimant's impairment; and 6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments.  *Brand v. Sec'y of the Dept. of Health Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion."  *Hensley*, 352 F.3d at 355.  If substantial evidence on the record as a whole permits an inference of two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or

merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

### A.   The ALJ's Refusal to Order a Consultative Examination

Brown contends the ALJ had the duty to order a consultative examination to fully and fairly develop the record because the record did not contain sufficient evidence to evaluate her mental impairments, and Dr. Pryce expressed concerns about her cognitive functioning on several occasions.   The Commissioner responds that Brown's own statements in her function report, and statements she made to her treating physician, provided ample evidence in the record for the ALJ to conclude Brown's depression was nonsevere.   Notably, Brown testified that she missed the appointment for a neuropsychological examination that Dr. Pryce suggested.   The Commissioner also maintains that Pryce failed to show any prejudice from the ALJ's failure to order a consultative examination.

Social security hearings are non-adversarial, and "the ALJ bears a responsibility to develop the record fully and fairly, independent of the claimant's burden to press his case[,]" even if the claimant is represented at the hearing. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (internal citations omitted).   "[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quoting *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (internal quotations and citation omitted)); *see* 20 C.F.R. §§

404.1517, 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical and mental examinations or tests).   A claimant must show the ALJ's failure to develop the record was unfair or prejudicial to warrant reversal. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

In an August 2007 Disability Report Brown completed for the SSA in August 2007, Brown suggested that depression played a part in her life after her car accident because she could not work. *Id.* at 154. She also alleged memory loss. *Id.* Brown and her sister completed Function Reports for the SSA in August 2007. *Id.* at 164-71, 149-93. As the ALJ noted, neither Brown nor her sister mentioned any cognitive or psychological impairments that affected Brown's daily functioning or ability to get along with others. *Id.*

Dr. Pryce treated Brown only for physical impairments, and his suggestions to have a neuropsychological examination were made in the context of trying to support Brown's claim of disability. The first time Dr. Pryce suggested Brown have a neuropsychological examination, October 12, 2005, Brown was homeless and receiving Minnesota Family Investment Program ("MFIP") disability payments. *Id.* at 273. Brown was requesting Dr. Pryce's assistance because people from MFIP wanted her to return to work. *Id.* Dr. Pryce noted Brown could not perform a job that required heavy lifting due to her back pain and this restriction precluded all work activity. *Id.* at 274. Dr. Pryce ordered a neuropsychological evaluation to determine if Brown was developmentally delayed or if she had a psychiatric illness. *Id.* Nothing in Dr. Pryce's treatment notes up

to this point suggested Brown had a cognitive or psychiatric impairment, and Dr. Pryce did not give any reasons for thinking she might have such an impairment. It is reasonable to believe that Dr. Pryce believed Brown was not disabled physically from all work activity, and that the only way he could help her get disability was to have her tested for cognitive or psychiatric illness.

The second time Dr. Pryce referred Brown for neuropsychological testing, March 24, 2006, Brown was feeling better physically and voiced no cognitive or psychological complaints. *Id.* at 267. In fact, she was "very happy" because her living situation improved. *Id.* Again, nothing in Dr. Pryce's treatment notes suggested Brown was having cognitive or psychological symptoms. Nonetheless, Dr. Pryce's treatment record contained a notation, "[a]lthough [Brown] has some back pain, that with advancing age and probably limited skill set and possibly other problems such as psychological or developmental, I am going to have her get Neuropsych testing for disability assessment." *Id.* at 268. Presumably, Dr. Pryce was trying to assist Brown's quest for disability because her physical impairments alone did not support her disability claim.

Two years later, Dr. Pryce observed Brown was still seeking disability, and he agreed she was disabled by lumbar spinal problems, "a little bit of neuropathy from diabetes," and depression with a possible anxiety component. *Id.* at 347. A mental health professional had never diagnosed her with depression, and she was not being treated for depression or anxiety with either medication or counseling. Brown complained of stress at times and appeared anxious, but her stress was related to homelessness, and her son's drug and legal problems. Even with these problems in her

life, Dr. Pryce only once commented that Brown was anxious.  *Id.* at 358.  More often, he commented on her ability to cope with her problems.  *Id.* at 257-58, 330, 359.

At the hearing before the ALJ on October 1, 2009, Brown's counsel asked her if she ever had a neuropsychological examination, and Brown said admitted missing the appointment.   Dr. Pryce referred Brown for neuropsychological testing as early as October 2005 and again in March 2006.  If Brown was in fact exhibiting symptoms of cognitive or psychological impairment that would support her claim for disability she would have followed up on Dr. Pryce's suggestions four years earlier for a neuropsychological evaluation.

In sum, Brown failed to seek treatment for cognitive or psychological impairments and was never diagnosed with any such impairment.  Dr. Pryce, Brown's primary care physician, did not treat or even offer to treat Brown for depression or anxiety.   Dr. Pryce's treatment records do not contain evidence suggesting Brown was suffering symptoms of a cognitive or psychological impairment, other than occasional situational stress. Brown's Function Reports do not reveal any cognitive or psychological limitations.  Sufficient records and evidence existed to support the ALJ's determination that Brown did not have a severe mental impairment, and the ALJ was not obliged to order a consultative examination.  *See Nicholas v. Barnhart*, 42 Fed. Appx. 902, at 81 (8th Cir. 2002) (finding no obligation to order a consultative examination).  There is no showing that the ALJ's failure to order a neuropsychological examination resulted in prejudice; no assertions that cognitive or psychologically-based symptoms affected Brown's ability to work exist.  *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)

28

(claimant failed to show prejudice from ALJ's failure to further develop the record regarding his medical care).

**B.    The ALJ's Evaluation of the Treating Physician's Opinion**

Brown argues Dr. Pryce's residual functional capacity opinion, restricting her to a sedentary exertional level was entitled to controlling weight because it is supported by Dr. Pryce's observations and treatment of her over an extended period, and on his review of her x-rays and MRI results. Brown claims that the ALJ substituted his opinion for that of a trained medical professional because he did not identify another medical opinion upon which he relied in determining Brown's physical RFC. Brown also asserts that if the ALJ found a conflict or ambiguity in Dr. Pryce's opinion, the ALJ was required to re-contact Dr. Pryce to resolve the issue.

The Commissioner counters that the ALJ gave good reasons for discounting Dr. Pryce's RFC opinion. First, the Commissioner contends Brown's normal or only mildly abnormal clinical examinations do not support Dr. Pryce's significant restrictions. The Commissioner maintains that the ALJ reasonably accommodated Brown's degenerative disc disease by limiting her to a reduced range of light work.

Second, the Commissioner argues that the ALJ correctly found Brown's level of activity inconsistent with Dr. Pryce's opinion. And, the ALJ found that Dr. Pryce made contradictory statements. Contrary to his opinion of Brown's disability, Dr. Pryce noted that Brown tolerated her back pain well. Dr. Pryce also told Brown that if she applied for disability, he did not think she would get it.

Third, the Commissioner asserts that the ALJ explicitly relied on the state agency physicians' opinions that Brown could perform a range of light work, and that the ALJ's reliance on their opinions was reasonable because they were consistent with the record as a whole.  Finally, the Commissioner submits that the ALJ was not required to re-contact Dr. Pryce to seek clarifying statements because the ALJ had ample evidence upon which to evaluate Brown's impairments, including Dr. Pryce's treatment notes, test results, state agency physicians' opinions, Brown's testimony, and Brown's statements in her function reports.

Typically, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Generally, a nonexamining medical source's opinion is not considered substantial evidence.  *Lauer v. Apfel*, 245 F.3d 700, 795 (8th Cir. 2001).  An ALJ may credit other medical opinions over that of a treating physician when better evidence supports the opinion or when the treating physician rendered inconsistent opinions.  *Prosch*, 201 F.3d at 1013; *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001.)  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall*, 274 F.3d at 1219 (internal citations omitted)).

Despite their differing conclusions, the physicians' opinions are primarily based on the same objective evidence, the 2007 MRI of Brown's lumbar spine showing degenerative disc changes with disc extrusions and stenosis at L5-S1, and clinical findings in the treatment records. Although Dr. Pryce had the benefit of considering post December 2007 evidence that Drs. Salmi and Eames did not review or consider, there was no objective evidence that Brown's back or knee condition worsened after December 2007.

Several factors support the ALJ's decision to grant greater weight to the RFC opinions of the nonexamining state agency physicians over that of the treating physician. First, Dr. Pryce's opinion was inconsistent with the record as a whole. Brown alleged chronic back pain from a car accident in May 2005, but after the night of the accident, she was never treated with pain medication. *See Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. 2003) (failure to request pain medication is an appropriate consideration in assessing credibility of a claimant's subjective complaints.) Also, few clinical supported back limitations. On the night of the accident, Brown had cervical tenderness, but she did not have spinal tenderness in her thoracic or lumbar spine or tenderness of her upper or lower extremities. (*Id.* at 228.) When Brown sought further evaluation of her back pain one month later, the clinical findings were minimal: moderate tenderness throughout the cervical, thoracic, and lumbar regions and shoulder joints; diminished cervical range of motion; but lumbar range of motion was not markedly diminished; and upper and lower extremity neurosensory evaluations were normal. *Id.* at 234. The only treatments

recommended were chiropractic adjustments, exercise, and electrical muscle stimulation. *Id.*

When Brown saw Dr. Pryce in July 2005, she did not seek any treatment for pain, she only sought support for her disability claim. *Id.* at 278-79. In fact, Dr. Pryce never actually provided Brown with any treatment for back pain, and it does not appear that he referred Brown to any other physician for treatment or evaluation of back pain.

Brown fell and hurt her knee on November 24, 2005, but she had full range of motion, intact strength, and the x-ray was negative for fracture. *Id.* at 244, 251-52. Dr. Pryce subsequently ordered physical therapy to treat Brown's knee pain, which improved from a reported pain level of six out of ten to a level one out of ten, after only a short course of physical therapy. *Id.* at 341, 351. Pain that is amenable to treatment is not disabling. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009).

In March 2007, Dr. Pryce noted Brown was asking for disability for back pain that went back "many, many years." *Id.* at 256. The fact that Brown worked as a bus aide from October 1996 through July 2004, when her job was eliminated, indicates Brown had been able to work despite her back pain that went back many years. *Id.* at 155, 24-25.

As a whole, the objective evidence in the record is that Brown's degenerative back condition caused no more than mild to moderate tenderness on examination, and that she had a minor, treatable knee injury. Other than the night of the accident in May 2005, Brown's pain never required her to seek medication. The objective evidence is consistent with Drs. Salmi and Eames' RFC opinions for light exertional work than Dr. Pryce's opinion of sedentary restrictions.

The most important factor supporting the ALJ's decision to grant greater weight to the nonexamining physicians' opinions is the inconsistency of Dr. Pryce's opinion with his own records. Dr. Pryce's opinion of September 2009, that Brown is limited to sedentary work without frequent lifting and carrying or "a lot of leg and foot controls," based on degenerative spine disease and diabetic neuropathy is inconsistent with his treatment records.

When Brown asked Dr. Pryce for support of her disability claim on October 12, 2005, Dr. Pryce stated that Brown could not perform jobs requiring heavy lifting due to her back pain. *Id.* at 274. A restriction against heavy lifting does not equate to Dr. Pryce's later opinion of a sedentary work capacity. When Dr. Pryce questioned Brown about disability on January 11, 2007, Brown complained of muscle spasms in her legs and feet, then, she "change[d] the story to her backaches. . .[a]t one point she says they [backaches] come and go, then she makes it sound like they are there all the time. Then she asks me about disability." *Id.* at 258. Dr. Pryce asked Brown why she could not work, and she responded that she had to care for her family, and employers would not let her miss work. *Id.* Brown was upset that day because her son was incarcerated and being moved around the state. *Id.* at 257. Dr. Pryce told Brown she would not get disability payments to allow her to stay home with her family, so Brown asked for a back workup because she had car accidents in the 1980's, 1999 and 2005. *Id.* at 258. On several occasions, Dr. Pryce noted Brown's back pain was stable or that she was tolerating her back pain well. *Id.* at 254, 269, 278, 358.

In September 2009, Dr. Pryce opined that Brown could not stand or walk more than two hours in a work day due to her lumbar spine disease and diabetic neuropathy. Treatment records, however, show that Brown's diabetes was well controlled usually, and little evidence that she suffered more than minimal tingling and numbness in her legs or feet. *Id.* at 254, 347, 355-56. Even more telling, Dr. Pryce evaluated and treated Brown for calluses on her feet because she spent so much time walking. *Id.* at 261-262, 269. Dr. Pryce never discouraged Brown from walking due to her back condition, he encouraged her to exercise to help control her diabetes. *Id.* at 328, 357.

Dr. Pryce assessed Brown with an RFC of lifting no more than ten pounds occasionally, but on several occasions, Brown either mentioned babysitting her one-year-old granddaughter or actually brought her granddaughter with when she saw Dr. Pryce. *Id.* at 270, 277, 278-79, 356. Common sense suggests babysitting a one-year-old requires lifting more than ten pounds. Furthermore, Brown's babysitting supports her statement to Dr. Pryce that the reason she could not work was that she needed to care for her family.

The record as a whole, especially inconsistencies between Dr. Pryce's RFC opinion and his treatment records, the objective evidence, Brown's activities, and Brown's lack of medication for back pain provides substantial evidence supporting the ALJ's decision to discount Dr. Pryce's RFC opinion and grant greater weight to Drs. Salmi and Eames' RFC opinions. There is no need for the ALJ to re-contact Dr. Pryce to clarify his opinion because Dr. Pryce's opinion is inconsistent with substantial evidence in the record, and Brown has not identified a crucial issue that was undeveloped. *See Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) ("the ALJ is not required 'to seek

additional clarifying statements from a treating physician unless a crucial issue is undeveloped'") (internal quotation omitted); *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (ALJ may discount treating physician's opinion without seeking clarification, if opinion was inconsistent with other substantial evidence). This Court recommends affirming the Commissioner's decision because it is supported by substantial evidence in the record as a whole.

## IV.    RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.    Plaintiff Brown's Motion for Summary Judgment [Doc. No. 15] be **DENIED**;

2.    Defendant Commissioner Astrue's Motion for Summary Judgment [Doc. No. 18.] be **GRANTED**;

3.    Judgment be entered and the case be dismissed.

Dated:  November 22, 2011

_s/Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **December 5, 2011**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.